[Civ. No. 14066. Second Dist., Div. One. Dec. 14, 1943.]

EASTERN-COLUMBIA, INC. (a Corporation), Appellant, v. COUNTY OF LOS ANGELES et al., Respondents.

Holbrook & Tarr, W. Sumner Holbrook, Jr., and Leslie R. Tarr for Appellant.

J. H. O'Connor, County Counsel, S. V. O. Prichard, Assistant County Counsel, Ray L. Chesebro, City Attorney, Frederick Von Schrader, Assistant City Attorney, and Louis A. Babior, Deputy City Attorney, for Respondents.

WHITE, J.—Plaintiff has appealed from a judgment in favor of defendants in this action which was instituted to obtain a refund on 1940-1941 taxes levied on two parcels of land and improvements, and which taxes had been paid under protest to the tax collector of Los Angeles County.

There are four causes of action involved. The first and third have to do with what we shall hereinafter refer to as Parcel I; the first cause is concerned with the payment under protest of the first installment of taxes, while the third involves the second installment of such taxes. Similarly, the second and fourth causes of action deal with the payment under protest of the two tax installments on what will hereinafter be designated as Parcel II.

## PARCEL I.

Parcel I is located at 848 South Hill Street, in the city of Los Angeles. It consists of a five-story, single-occupancy, loft-type, Class A building, originally constructed in 1912 as a two-story and basement structure. In 1921 three stories were added and in 1924 a basement sprinkler system was installed.

We think it may fairly be said that the record contains no contradiction of the fact that for years prior to the first Monday in March, 1941, this structure remained vacant and that on May 16, 1941, plaintiff herein purchased the entire parcel for the sum of $42,500.

The challenged assessment levied against this property was as follows:

| | |
|---|---|
| Land | $32,680 |
| Improvements | 16,230 |
| Total | $48,910 |

## PARCEL II.

This property is located at the corner of Ninth and Broadway in downtown Los Angeles. It is improved with a 12-story and basement, single-occupancy building used by plaintiff as its main store building. This structure was erected in 1930 and from time to time was slightly altered. In the assessment which is here in question this property was assessed as follows:

| | | |
|---|---|---|
| Land | Lot I—$183,700 | |
| | Lot II— 137,880 | |
| | | $321,580 |
| Improvements | | 420,000 |
| Total | | $741,580 |

Believing itself aggrieved and over-assessed as to both parcels, plaintiff applied to the board of supervisors, sitting as the county board of equalization, for a reduction of the assessment, on the ground that the aforesaid assessed valuations placed on plaintiff's property and improvements were grossly excessive and that the taxes were excessive, erroneous, discriminatory and inequitable. After hearing had before the county board of equalization, that tribunal denied plaintiff's application.

Thereafter plaintiff commenced this action, alleging that the assessed valuation placed on its land contained in Parcel I, in the sum of $32,680, was excessive and erroneous in the amount of $680; that the assessed valuation placed on the improvements attached to Parcel I, in the sum of $16,230, was excessive and erroneous in the amount of $11,230; that the assessment of Lots I and II in Parcel II, in the sums respectively of $183,700 and $137,880, was excessive and erroneous in the amount of $19,825 on Lot I; $14,255 on Lot II, and as to the improvements attached to Parcel II, the assessment of $420,000 was excessive and erroneous in the amount of $207,500.

Upon this appeal it is conceded by all parties, as was found by the trial court, that the assessor was required to assess both lands and improvements in 1941 at 50 per cent of their respective market values.

We are impressed that the issue raised by plaintiff herein may be epitomized by saying that it is based on the claim, which it is contended is supported by the record of the trial, that, notwithstanding good and substantial evidence presented by plaintiff to the board of equalization, that board, in disregard of the evidence adduced, did arbitrarily and wilfully deny the application for redress and did accordingly intentionally impose upon plaintiff such an unfair and unequal burden of taxation as to amount to constructive fraud. In support of this claim plaintiff offered before the board of equalization evidence to substantiate the charge that the "land" value was too high and that the "improvements" value was grossly overestimated and was arbitrarily fixed by considering only reproduction cost of such improvements, less depreciation, divided by two.

Moreover, it is contended by plaintiff that the evidence adduced at the trial established the fact that at the hearing before the board of equalization plaintiff presented the affidavits of two appraisers, possessing impressive qualifications and experience, and which affidavits contained the respective opinions of deponents as to the market value of each of the two parcels in their entirety as well as when divided between the land and improvements. These affidavits also alleged on information and belief that the assessor's valuations on improvements had been erroneously arrived at by taking 50 per cent of his computed reproduction cost of such improvements, less physical depreciation of the two build-

ings, and that such valuations were not arrived at by the assessor in accordance with the accepted principles used in determining market value of improved parcels. Before the board of equalization two appraisers, who made the aforesaid affidavits, testified as to the market value of both land and improvements included in both parcels, as did J. M. Sieroty, vice-president and general manager of plaintiff company. Ben McElroy, an official of plaintiff corporation, also testified in its behalf.

On the basis that the assessed value of both land and improvements should be at 50 per cent of their respective market values, the following is a tabulation of the assessment value of both parcels as reflected by the testimony of the first three of the just mentioned witnesses.

## PARCEL I.

Assessed by Assessor ......................$ 48,910
Assessed value as testified to by Reese........ 37,500
Assessed value as testified to by Frisbie....... 38,750
Assessed value as testified to by Sieroty....... 42,500
(purchase price)

## PARCEL II.

Assessed by Assessor ......................$741,580
Assessed value as testified to by Reese........ 537,500
Assessed value as testified to by Frisbie........ 512,500
Assessed value as testified to by Sieroty...... 500,000

Plaintiff also offered in evidence at the hearing before the board of equalization a diagram comparing the assessed value of its property at the corner of Ninth and Broadway (Parcel II) with the assessed value of the next adjoining "inside" lots. There was also introduced in evidence certain records of the assessor's office commonly referred to as "the building slips" on the property in question. With reference to the attack made upon the assessor's method of computing the assessed valuation and which charges were made "on information and belief," it should be noted that when the witness Mr. Frisbie, who had made one of the affidavits, was asked on cross-examination whether he knew of his own knowledge what method the assessor had used in making the assessments here involved, he replied, "No, I do not. I had no opportunity to study the forms"; while Mr. Reese, who made the other affidavit, when asked the same question,

replied "Not on these particular properties, no, sir." The gist of the attack made upon the assessor's method was that the same was arrived at on the basis of reproduction cost, less depreciation, as set out on "building slips," without consideration of any other matters and without taking into consideration any other factors that go to make up the value of improvements.

At the hearing before the board of equalization the assessor offered in affidavit form the testimony of Edward K. Potter, employed in the office of the assessor of Los Angeles County since 1916 and who has since 1922 been in charge of the appraisals of buildings. With reference to the assessment here involved, his testimony was that the same was arrived at by pursuing the following procedure "We noted the location of the building, that is, whether proper, marginal or poor, we noted its functional plan, whether modern, average, fair or poor, its architectural attractiveness, whether good, fair or poor, its condition, whether excellent, average, fair or poor, its conformity, whether proper or improper. We had before us an appraisal made by C. C. Brothers, who is an expert appraiser employed by the Los Angeles County surveyor's office, as to the market value of the property taken as a whole, including both land and improvements, and we considered that appraisal as one of the elements to be considered when we made up the assessment upon the particular property here in question. The land department of the assessor's office made an appraisal of the land here in question and we had before us the appraisal which that department made of the land and considered it as one of the elements to be considered in making up the assessment with reference to the building. We employed the figure placed upon the land by the land department of the assessor's office in order that we might consider the improvements as residual. We made a study of the cost of constructing buildings and other improvements and we computed what in our opinion was the replacement cost of the improvements upon this property new, and we then made a computation as to what the replacement cost of the improvements here in question were new less depreciation. This computation was before us in making up the assessment upon the improvements here in question and we considered the matter of replacement cost less depreciation as but one of the elements to be considered in fixing the value which we did fix upon this property."

The affidavit of this witness further shows that the assessor had made a detailed study of the income of 270 large office and department store buildings, including plaintiff's building on Parcel II, and the assessment made herein took that study into account.

With reference to Parcel I, which is the Hill Street property, there was offered in evidence before the board of equalization the statement of J. W. Hartman, assistant assessor of Los Angeles County, who, after stating his qualifications, which included the fact that he had been in the employ of the assessor's office since September, 1924, went on to state that the Los Angeles County assessor's office appraises annually 1,250,000 parcels of land, 800,000 items of personalty, with 54,000 new structures. With reference to the "method" adopted by the assessor, Mr. Hartman stated that one factor shown on the "building slips" is the square footage; that the field appraiser establishes a unit-value factor and makes a mathematical calculation upon the building slip, multiplying the square footage by the unit-value factor; that the "building slip" does not and cannot show all of the factors taken into consideration in determining the unit-value factor. He further stated that the total figure shown on the slips does not represent replacement or reproduction cost; that the figure represents the fair value of the structure. He further stated that the appraisers consider (1) the site and the surrounding territory, (2) the assessed value of "parcels," (3) construction costs, (4) sales and listings, (5) income and kindred factors. Mr. Hartman then stated that the preliminary appraisal thus made is then revised and coordinated by the supervisors in the department of the assessor to equalize the results all the way across the face of the county.

While the magnitude of the assessor's task to appraise and assess all of this property, within the limited time elapsing between the first Monday in March and the first Monday in July of the same year, affords no justification for an illegal tax, it does demonstrate the necessity for him to promulgate certain general rules and formulas of percentages of depreciation, construction costs, square foot area charges and other factors in order to secure uniformity in valuations as required by law. Indeed, his right so to do, as well as "methods" adopted similar to the ones used in the present case, received the imprimatur of the Supreme Court of this

state in the case of *Rittersbacher* v. *Board of Supervisors,* 220 Cal. 535, 543 [32 P.2d 135]. While the testimony of expert witnesses produced by plaintiff before the board of equalization was in sharp conflict with the assessed value arrived at by the assessor, that fact does not make it compulsory for the board to adopt the testimony of plaintiff's witnesses as determinative of the market value or assessment value of the property in question. This for the reason that giving such testimony its full weight, it does not establish the assessor's appraisals as a "lack of equalization." ▮ The purpose of the board of equalization is to see that all properties in the county are "equalized"; that is to say that the assessor appraise all properties in the county at a constant level of opinion as to market value and keep all properties in their proper relationship one to the other. It therefore follows that the mere fact that an assessment against particular property, not discriminatory or inequitable on its face, is in excess of the fair value of the property, is not in itself evidence of fraud. In accord with what we have just said, there is contained in *Hammond Lumber Co.* v. *County of Los Angeles,* 104 Cal.App. 235, at page 240 [285 P. 896], the following language "Hence, mistakes or overvaluations honestly made are not grounds for refund of a protested charge." There must be a conscious failure to exercise a fair and impartial judgment, or a resort to arbitrary methods, different from those employed in assessing other property of like character and situation; thereby resulting in designedly imposing an unequal burden on the property of the complainant, before an assessment will be invalidated (*Hammond Lumber Co.* v. *County of Los Angeles, supra,* at page 240, and numerous cases therein cited). ▮ Where, as in the instant case, the taxpayer feels he has just cause for complaint, the law has set up a tribunal composed of the board of supervisors, sitting as a board of equalization, to determine the facts. When such board, after due hearing, and within the limits of reasonable discretion, has made its findings on the facts such decision is final and conclusive. Before the decision of the board, constituting as it does an independent and conclusive judgment, abrogating and taking the place of the judgment of the assessor, will be set aside by the courts on review, even though there be error or mistake, there must be proof of actual fraud, or such arbitrary, unreasonable or grossly oppressive action, which

wilfully transgresses or disregards law, and amounts to constructive fraud (*Hammond Lumber Co.* v. *County of Los Angeles, supra,* at page 241). Where, as here, the assessment is not wholly void, an action such as the present one, though partaking of an action to recover a tax paid under protest is in fact, and properly so, a proceeding to review the decision of the board of equalization. In such a proceeding the function of the trial court therefore, was to determine whether a correct method of valuing the land and improvements was followed, and then, to ascertain whether there was substantial evidence before the Equalization Board to justify the assessment as made (*Hammond Lumber Co.* v. *County of Los Angeles, supra,* at pages 241 and 242). In other words, as was said in *Hammond Lumber Co.* v. *County of Los Angeles, supra,* at page 243: "the question before the trial court was not whether, through some miscalculation, mistake or oversight, there had been an erroneous valuation, but whether the method pursued had resulted in an overcharge so disproportionate and exorbitant as to produce an illegal assessment and tax."

From what we have heretofore said, it is manifest that there was substantial evidence before the trial court to support its finding against plaintiff upon the latter's allegations and claims that the system adopted by the assessor for the assessment of improvements was "based solely upon the estimated reproduction cost new, less physical depreciation, of each particular improvement," and was therefore a "discriminatory, erroneous and illegal system." We are also persuaded from a reading of the record that it must be held that before the board of equalization there was evidence of sufficient substantiality to support the finding that under the system adopted by the assessor he was justified in making the assessment he did, which assessment was upheld by the board.

At the trial plaintiff offered the testimony of Thurston Ross as an expert witness. This testimony was proffered on the theory that it would "assist the court in determining the correctness of the methods used by the assessor, in the light of the practices employed in the business world in determining market value of real estate." The testimony in question was rejected by the court. In so doing, we are convinced the court committed no error. Both the assessor and the board of equalization exercise judicial functions,

and when they have acted within the limits of reasonable discretion, their judgment cannot be controlled by the courts. It is only when the conclusions of assessing officers, as to the value of property for purposes of taxation, are not honestly arrived at, or are made in pursuance of some fixed rule or general system, the result of which is necessarily discriminatory and inequitable, that the courts will interfere. And this is true, however erroneous the conclusions of these officers may be (*Birch* v. *County of Orange,* 59 Cal. App. 133, 136 [210 P. 57]). Market values after all become to a very large extent a matter of opinion. And in the case just cited, which is strikingly similar to the one at bar, the court said at page 139 ''Having determined that the assessor did not adopt an unauthorized method in arriving at the value of plaintiffs' property for assessment purposes, it at once is apparent that the court committed no error in sustaining objection to questions asked of a witness by whom it was proposed to show the various factors that should be considered in estimating the value of oil-producing property.''

By the same token, the trial court herein was not in error when it refused to receive the testimony of the expert witness, Thurston Ross, through whom it was proposed to show what were the various factors which should have been considered by the assessor in estimating the value of plaintiff's property.

The extent of the court's review was limited to ascertaining whether the acts of the assessor and the board of equalization are open to the charge of fraud, actual or constructive. The question is not what someone else, however eminent he may be in the field of appraisal work and knowledge of market values, may think is the proper method, but involves simply the determination as to whether the method used by the assessor was legitimate and fair, and was a reasonable method to use in arriving at the value of the property in question.

County boards of equalization are creatures of the Constitution itself (art. XIII, sec. 9, California State Constitution), and are quasi judicial bodies. Therefore, the taxpayer must fully and fairly present the question of the value of his property to them before he is entitled to attack their determination in court. Were the rule otherwise, the taxpayer could make a perfunctory showing before the board and reserve his real showing for a subsequent appeal to the

courts. This is not permissible (*Merchants Trust Co.* v. *Hopkins*, 103 Cal.App. 473 [284 P. 1072]).   As we have pointed out, a proceeding such as the instant one savors of certiorari or review. The sole issue before the court was, therefore, whether the decision of the board of equalization was based on fraud or the equivalent of fraud. And that determination must be based upon the evidence at the trial of the proceeding had before the board.   The board of equalization cannot be held to have committed fraud, either actual or constructive, upon evidence which was never presented to it (*Wild Goose Country Club* v. *County of Butte*, 60 Cal.App. 339 [212 P. 711]).   While the expert testimony of Mr. Ross would have been pertinent and material before the board of equalization, not having been there offered it cannot be received in a later judicial review, where the conduct of the board must be determined from the evidence presented to it.

  It is next contended by appellant that it was denied due process of law at the hearing before the board of equalization. In support of such claim appellant charges that the board permitted officials of the city of Los Angeles to communicate with it twice while sitting as such board, all of which assertedly took place out of the presence of appellant taxpayer and its counsel; without their knowledge and without opportunity of cross-examination or refutation. In this regard the record discloses that in the spring of 1941 a meeting was held which was attended by a group of city and county officials. It appears that at such meeting there was a discussion of varied matters in which the city and county were jointly interested and the city representatives were interested in the question of whether the total assessed valuation of property in the city or county was to be increased or decreased. The discussion seems to have involved only the interest of the city in being heard if the assessment value of business property was to be lowered. Thereafter and on July 3, 1941, the mayor of the city of Los Angeles addressed a letter to the board of supervisors regarding the method which, in his opinion, should be pursued in the presentation of evidence which the city might care to introduce before the board of equalization. It was suggested that the city be supplied with a list of cases in which it might be interested so that the city officials might have an opportunity for the presentation of evidence. This letter was read to the

board of supervisors at a meeting held July 7, 1941. Obviously, the trial court concluded that the suggestion of the city that it be allowed opportunity to present evidence was recognized by the board of supervisors as a reasonable one and the members of the board, together with the county assessor, engaged in a discussion and made comments thereon. It is noteworthy, however, that Mr. John R. Quinn, Los Angeles County assessor, pointed out that after the property owner's case had been concluded it would not be fair, nor legal, nor proper, to notify the city and then have its representatives introduce such evidence as it might desire. Commenting favorably upon this statement of the assessor, Supervisor McDonough moved that the county counsel reply to the mayor's letter advising him that "the evidence, if any, should be included in the case at the time that the board is hearing it and then take the whole thing under advisement." By vote of the board of supervisors the county counsel was authorized and did reply to the letter of the mayor. The gist of such reply so far as here pertinent was that "By reason of the fact that the board of equalization occupies a quasi-judicial position before whom the property owner is entitled to be confronted with the evidence against him and to offer evidence in rebuttal, literal compliance with that part of your request outlined in the last two paragraphs of your letter is practically impossible." The county counsel suggested that the city have a representative present at hearings before the board of equalization and should they desire to be heard in connection with any particular assessment they might request a continuance to a future date, of which date the property owner would have notice, an opportunity to be present, and to be further heard in rebuttal. Thereafter, in response to a second communication from the mayor to the board of supervisors, Supervisor Hauge made this statement "Mr. Chairman, I think that is all beside the question as a board of equalization. I don't believe that this board can possibly yield and do it correctly to any outside influence as to its judgment pertaining to equalization. In the main I approve of the letter." Following further and brief discussion it was moved and voted that the communication of the mayor be received and filed.

Under all the circumstances as presented by the record, we are persuaded that the trial court was justified in its finding that the entire episode or series of episodes relied

upon by appellant had no effect whatsoever upon the outcome of appellant's case before the board of equalization. No prejudice to appellant having resulted, a reversal of the judgment herein is neither authorized nor justifiable.

Appellant's contention that members of the board of equalization did not "so much as glance" at certain proffered evidence before it, is equally without merit. Three members of the board of equalization were called by appellant at the trial and cross-examined at length in this regard. The court heard this evidence which justified its finding that "said members of the board of equalization heard and examined the evidence which was introduced by both parties, both that which was oral and that which was introduced by way of affidavit and exhibit, and in denying said application said board of equalization acted fairly and impartially upon their consideration and determination of all the evidence before them."

For the foregoing reasons the judgment is affirmed.

York, P. J., and Doran, J., concurred.

A petition for a rehearing was denied January 4, 1944, and appellant's petition for a hearing by the Supreme Court was denied February 10, 1944. Shenk, J., Edmonds, J., and Schauer, J., voted for a hearing.